255 So.2d 776 (1971)
Robert A. BOURE
v.
NEW ORLEANS PUBLIC SERVICE, INC.
No. 4585.
Court of Appeal of Louisiana, Fourth Circuit.
December 6, 1971.
Rehearing Denied January 10, 1972.
Writ Refused February 14, 1972.
*777 Badeaux, Discon & Cumberland, Reginald T. Badeaux, Jr., John G. Discon, and J. Michael Cumberland, New Orleans, for plaintiff-appellant.
A. R. Christovich, Jr., C. B. Ogden, II, New Orleans, for defendant-appellee.
Before LEMMON, STOULIG, and BOUTALL, JJ.
STOULIG, Judge.
This is a damage suit by Robert A. Boure for injuries he received when a paint spray hose he was operating came in contact with high tension wires maintained by defendant, New Orleans Public Service, Inc. It is plaintiff's position that the defendant (hereafter referred to as Public Service) was apprised of facts making the accident foreseeable and was negligent in failing to take steps which could have prevented its occurrence. The district court disagreed, holding that defendant had breached no duty of care owed to plaintiff, and, accordingly, denied recovery. From this adverse judgment plaintiff has appealed.
The basic facts surrounding the accident itself are undisputed, and are, briefly, as follows: On Saturday, May 15, 1965, plaintiff was engaged in his employment as an industrial painter for Becnel-Groetsch & Co., Inc., painting contractors, and as such was, along with a helper, spraying the steel structures on the underside of the I-10 bridge being constructed by Boh Brothers Construction Co., Inc. (general contractor), over the Industrial Canal in the City of New Orleans. At the point of his endeavors plaintiff and his coworker, Donald E. Talton, were approximately 90 feet above the ground. Ten feet below them burlap netting had been installed to catch paint which might otherwise fall on passing vehicles below. Beneath the burlap, at a distance of about 6 feet 8 inches lay the uppermost "live" wire of a series of transmission lines which ran under the bridge, perpendicular to it. Each line carried 115,000 volts of electricity. Boure was painting with a spray gun attached to a hose, approximately 200 to 250 feet long, and connected to a compressor and air pump which rested on the concrete roadbed above them. While Boure was spraying, the hose came into contact with the power line below, causing an explosion which knocked both him and his helper, Talton, off of the "pick" (scaffolding) on which they had been standing. Talton fell onto a beam some 3 or 4 feet below while Boure was thrown into the burlap netting. Though he was temporarily knocked out, Boure regained his consciousness and remained in his precarious situation until he was rescued approximately two hours later by the New Orleans Fire Department. As a result of the physical injuries suffered and, more particularly, his claimed traumatic neurosis, which has allegedly affected his earning capacity, Boure has brought this suit for damages against Public Service.
Before discussing the specific claims of the parties, which will necessitate an examination of the testimony contained in the record, it seems appropriate that we first review the general duty of care which the law places upon a power company in the construction and maintenance of its lines.
*778 It is generally recognized by our courts that the highest degree of care is placed upon those who utilize dangerous high power lines in their business operation. In Calton v. Louisiana Power & Light Co., 56 So.2d 862 (La.App.2d Cir. 1952, amended and affirmed 222 La. 1063, 64 So.2d 432 [1953]), the court noted:
"* * * a high voltage electric power line is a subtle, invisible, and highly dangerous force and that by reason of this characteristic the very highest degree of care to avoid injury is required of those who make use of such a dangerous agency in their business. * * *" 56 So.2d at 864.
The court then went on to quote the following language from 18 American Jurisprudence, pp. 443, 446, par. 48, which it found to be in accord with the jurisprudence of this state:
"* * * `While the measure of duty resting upon electric companies in order to exonerate them from liability for negligence is expressed by the courts in forms varying from reasonable or ordinary care and diligence to a close approximation to the view that they are insurers, yet the generally accepted rule in such cases, as in determining liability for negligent injuries generally, is that such companies are bound to use reasonable care in the construction and maintenance of their lines and apparatus that is, such care as a reasonable man would use under the circumstancesand will be responsible for any conduct falling short of this standard. The degree of care which will satisfy this requirement varies, of course, with the danger which will be incurred by negligence and must be commensurate with the danger involved. According to numerous decisions where the wires maintained by a company are designed to carry a strong and powerful current of electricity, so that persons coming in contact with them are certain to be seriously injured, if not killed, the law imposes upon the company the duty of exercising the utmost care and prudence consistent with the practical operation of its plant to prevent such injury; * * * The law is complied with when the company provides such a protection as will safely guard against any contingency that is reasonably to be anticipated. The company is not legally bound to safeguard against occurrences that cannot be reasonably expected or contemplated.'" 56 So.2d 865.
See also Allien v. Louisiana Power & Light Company, 202 So.2d 704 (La.App.3d Cir. 1967); Stansbury v. Mayor and Councilmen of Morgan City, 228 La. 880, 84 So.2d 445 (1955).
The question, then, is whether the defendant has breached this high degree of care which has been legally imposed upon it. Plaintiff maintains that it has. He specifically alleges that Public Service was aware of the dangerous situation of men working over the wires, including a knowledge of prior accidents, which it ignored, and that it took no steps which might have avoided injury to plaintiff or any others similarly situated. Public Service admits that a dangerous situation existed, but insists that it exonerated itself from any fault through repeated warnings to both Boh Brothers and Becnel-Groetsch of the dangers inherent in working over the wires and by further offering to arrange, upon their request, a temporary "outage." This last procedure would, through a process of rechannelling, have freed these lines of electricity for the period of the outage. Public Service maintains that no such request was ever made and it should not be held to have anticipated that the men would be working over the wires on the Saturday afternoon of the accident.
In order to determine the validity of these opposing claims it was necessary for this court to closely review the testimony adduced upon trial of the matter. In so doing, the court found numerous ambiguities, contradictions and subtle nuances which tended to obfuscate the true facts *779 and thus make difficult an accurate assessment of liability. Nevertheless, after carefully reviewing and analyzing the testimony of the witnesses, we have concluded that it does not support the trial court's holding that the New Orleans Public Service was free of negligence in its actions and responsibilities to the plaintiff.
It should be noted from the outset that Public Service has not been found to have violated any codal regulations regarding the construction or maintenance of its lines. The sole issue, therefore, regarding its negligence was whether or not it had sufficient notice that work was being done over the lines to have made it incumbent upon it to have taken sufficient preventive action.
It is clear from a reading of the trial court's opinion that the basis for Public Service's exoneration was its statement to both Boh Brothers and Becnel-Groetsch less than two weeks prior to the accident that it was, in the words of the court, "ready, willing and able to re-route and/or de-energize these wires when work was to be done in the area." Since no request was ever forthcoming from either of these parties, the court concluded that Public Service could not be held responsible for the consequences of their (the contractors') inaction.
Implicit in this conclusion is a finding that at the time of this offer Public Service was unaware that work over these wires was in progress. However, the trial judge foundand the record will bear him out that the defendant was, indeed, fully aware that work was being done in this area and that a dangerous situation already existed. We do not quarrel with the trial court's finding of fact but we do disagree with its interpretation of the law relative to negligence. More specifically, the conclusion that the offer to de-energize its power line was legally sufficient to exonerate it of negligence, despite its knowledge of workmen's activity in the immediate proximity of the dangerous instrumentality, is erroneous.
A review of the record leaves little doubt that Public Service was aware of the dangerous situation prior to the accident and, in fact, at the time the offer to "de-energize" was made. The record is replete with statements by Public Service employees to this effect.
Emmet A. Spies, general foreman of line construction for Public Service, stated that he had occasion to go to the I-10 bridge where it crossed France Road (the site of the accident) twice in May of 1965 prior to the incident on the 15th. The first time was in early May "after the 5th" but "way before the accident," at which time he noticed the burlap (under the painters) had gotten slack, and was sagging down into the lines (tr. 123), and was touching the feeder (tr. 127). He also stated he saw three men working in the vicinityone on top of the bridge with the compressor and two under the bridge (tr. 128). He considered it a dangerous situation, and notified Mr. Fitch (John B. Fitch, senior electrical engineer for Public Service), who then made the offer to de-energize. Spies stated he was also at the site on May 14, the date that the testimony shows a ladder fell into the wires causing an outage. He states that the reason he was at the scene on the 14th was that he had "seen them working over that line" (tr. 123).
The testimony of Fred Landry, job superintendant for Boh Brothers, is also relevant. Landry testified that he was aware of the danger of working over the wires, and prior to May 15 had warned the painting subcontractor and foreman himself "where they were working and about the high voltage." (Tr. 86) He further testified that Public Service had warned them about the dangers of working in close proximity to the high voltage wires: "When they would pass there and see activity they would warn us." (Tr. 94) Landry stated that these warnings by Public Service were given "two weeks, a month, in there" prior to the accident. (Tr. 94)
Daniel Knight, an engineer in the electrical department of Public Service, testified *780 that he was in the area on May 5, the date that the record shows a rope to have gotten in the lines. He stated that he was notified of this incident and several days or a week later he rode out to the site after being called by Mr. Dupre, the man in charge of the electrical service station, and saw the canvas (burlap) "hanging over." (Tr. 131) A day or two later he spoke with Mr. Becnel and cautioned him about the work he was doing over the Public Service wiresthat the lines were energized and there would be an explosion if something came into contact with them. (Tr. 132) Knight also stated that he discussed with his superiors the situation of the painters working on the bridge and of the burlap which was tied to it (tr. 135). He further testified of his recommendation to Mr. Dreuting (of Boh Brothers) that he should impress upon the contractors that they should not hang anything lower than the burlap. (Tr. 136) Knight also testified that the voltage in these wires was too high to permit their insulation.
John Prendergast, manager of the Industrial and Government and New Sales Division of New Orleans Public Service, testified from the notes of O. V. Baldwin, a retiree of Public Service. Those notes reflect that on May 3 he had discussed with a Mr. Tranquet of the Louisiana Department of Highways the painting of the bridge, making reference to their working close to "our line" on I-10 and had noted "dangerous." The notes also indicate Baldwin made several telephone calls on May 10 regarding the dangerous situation at the I-10 bridge over the Industrial Canal.
Also presented as a witness was Bruce Authement, a service dispatcher for the defendant, who testified from the daily log kept by his employer and from his own personal knowledge. He stated that at 9:26 a. m. on the 14th a high line feeder was kicked out at France Road over the I-10 bridge. The cause of the outage was a fallen metal ladder which came into contact with the two lower conductors of the feeder, damaging them. (Tr. 36) He assumed that the ladder was being used by the painters who were working that day, and characterized the circumstances in his report to his employer as a dangerous situation.
Perhaps the most significant testimony of all is that of John B. Fitch, senior electrical engineer at Public Service. It was Fitch's offer to "de-energize" which was so crucial in the lower court's decision to exonerate defendant. Therefore, a particularly close examination of his statements is necessary.
Fitch confirmed that he did receive a telephone call from Emmet Spies in late April or early May informing him that the painter's burlap drop cloths were dangling dangerously near Public Service's transmission lines (tr. 160). In addition to this information, Fitch also had personal knowledge of this fact. He stated that he lived near the area of the construction, passing it frequently, and confirmed that from his own observations he felt a dangerous situation existed. Accordingly, at Spies' request, Fitch contacted Mr. Dreuting at Boh Brothers, and also called Becnel-Groetsch, advising them that the burlap was dangerously near the transmission lines and could result in putting a large area out of service. In addition, he warned them if there were any people in the area that it could be dangerous to them, and suggested that "when the situation warranted it they could arrange with us * * * to have the line taken out of service."
It is the opinion of the court that this offer is insufficient to exculpate the defendant of negligent conduct, for it was made at a time when Public Service was aware that the painting of the bridge in proximity to the wires was in progress and at a time when Fitch by his own admission was aware that a dangerous situation already existed. Under these circumstances such notice or request would have been superfluous. The testimony of the witnesses simply does not support a version of events *781 in which Public Service was unaware of an existent danger.
As we have noted earlier, the duty our law places upon those who utilize high tension lines in their work is one to use the very highest degree of care to avoid injury. As stated in Webb v. Louisiana Power & Light Co., 199 So. 451, 452 (La. App.2d Cir. 1940), in a quote from Anderson v. Southern California Edison Company, 77 Cal.App. 328, 246 P. 559, 562:
"`* * * It is only in accord with reason and common sense that persons controlling so dangerous and subtle an agency as electricity should use a high degree of care. Either the wires must be insulated or at least placed beyond the danger line of contact with human beings. While the law does not require the wires to be insulated everywhere, where there is reason to apprehend that persons may come in contact with them in the pursuit of their calling or where they may be reasonably expected to go, they should in some manner be protected.'"
While the testimony shows that the wires in question could not have been insulated it also shows, through Public Service's own witness, Rodney A. Mouton, that de-energization would have been a relatively simple matter (tr. 182). Under these circumstances, it cannot be argued with any degree of persuasion that defendant met the duty of exercising the very highest degree of care or that it safeguarded against any contingency that was to be reasonably anticipated. The actionor inactionof Public Service clearly falls into the category of negligence as defined by the case of Goff v. Carlino, 181 So.2d 426, 428 (La.App. 3d Cir. 1965, writs refused): "* * * [C]onduct which creates an unreasonable risk of foreseeable harm to others."
The issue of the plaintiff's contributory negligence was never considered by the trial court in view of the finding that the defendant was free of fault. However, since we have reached a different conclusion, and do find that the defendant is guilty of negligence, it now becomes necessary for us to determine whether or not Mr. Boure' was also guilty of negligence which efficiently contributed toward the occurrence of the accident resulting in his injuries. A review of the record fails to disclose any action on the part of the plaintiff which could be legally construed as negligent conduct.
Though Mr. Boure' testified that he was not aware of the presence of the high power lines beneath the bridge, he is legally charged with such knowledge since they were readily apparent to anyone exercising even the most casual observation. However, even had he possessed this knowledge and governed his actions accordingly, he still could not have prevented the occurrence of the accident, for it was not attributable to a lack of knowledge or the failure to take adequate measures to protect his safety. He had no control over New Orleans Public Service's failure to deenergize its transmission lines; nor could he have requested such action. He had no control over the general contractor or his immediate employer. He had no control over the location of the equipment consisting of compressor, pump, and hose the position of which would be determined by the area which he was painting. Finally, the responsibility for keeping the hose taut to prevent it from coming in contact with the high power lines devolved upon his helper, Donald Talton. He also testified that he was not aware of any previous incidents involving falling objects coming in contact with the power line.
Contributory negligence is a special defense which the pleader must establish by a preponderance of evidence. There exists a presumption that when a person is in the presence of a known danger, or one with whose knowledge he is charged to constitute contributory negligence it must be shown that he voluntarily and unnecessarily exposed himself to danger. Stansbury v. Mayor and Councilmen of Morgan City, supra; Layne v. Louisiana Power & Light *782 Co., 161 So. 29 (La.App.2d Cir. 1935). We find an insufficient evidentiary basis to warrant a finding that the defendant did bear the burden of proof exacted.
We turn now to the issue of plaintiff's injuries, which from a pathological standpoint were objectively slight. Though stunned for several minutes, after his rescue by the fire department he literally walked away from the scene of the accident, and did not seek medical assistance until two days later. Dr. Richard Paddison's examination revealed a swelling of the right arm and forearm, together with tear-producing flash burns of his eyes. As a precautionary measure, X rays were made and proven to be negative. There was no evidence of any neurological deficit.
Due to the patient's complaints of nervousness, fear of climbing, restlessness during sleep, and sweating of the hands and feet he was referred to Dr. Alvin Cohen, a psychiatrist. These complaints were diagnosed as symptomatic manifestations of a moderately severe traumatic neurosis, which he related to the frightening and traumatic experience of the fall and electric shock since there was no evidence of neurosis prior to the accident.
Plaintiff, who was 33 years old at the time of the accident, and who had been a steeplejack painter since he was 16 years old, was immediately placed on a psychotherapy regimen and, after one year without progress, was confined to DePaul Hospital for nine days, after which he was discharged and returned to outpatient treatment. He remained under the care of Dr. Cohen until June 7, 1968. This doctor is still of the opinion that plaintiff is to a lesser degree suffering from the traumatic neurosis, but that he can work where climbing is not involved, although he has somewhat of a diminished endurance capacity which contributes to his inability to maintain steady employment at ground level. The record bears out that Mr. Boure' did not work at all for about eight months following the accident, but thereafter worked intermittently up to the date of trial and, in several instances, engaged in strenuous activities of masonry work. However, his earnings have been considerably less because of his inability to pursue his lifetime trade.
The defendant's expert witness, Dr. Conrad Wall, concurs in the diagnosis of Dr. Cohen of an anxiety neurosis, with phobias precipitated by the accident. He is of the further opinion that with the proper treatment Mr. Boure' will be able to return to his former hazardous occupation following an indefinite period during which he will engage in other work.
From the medical evidence we conclude that Mr. Boure' did suffer a moderately severe traumatic neurosis with a phobia against heights and climbing, but that he has made sufficient progress to engage in work compatible with this neurosis.
After considering the nature and extent of the plaintiff's injuries, the pain and suffering in connection therewith, and the past and future loss of earnings attributable thereto, we are of the opinion that the sum of $18,250 is adequate compensation for these damages.
For these reasons, the judgment of the lower court is reversed, and judgment is rendered herein in favor of the plaintiff, Robert A. Boure', and against the New Orleans Public Service, Inc., in the full sum of $18,250, together with legal interest from the date of judicial demand until paid. The defendant-appellee is cast for all costs of these proceedings and of this appeal.
Reversed and rendered.