300 So.2d 546 (1974)
Andy Clinton HARPER
v.
NEW ORLEANS PUBLIC SERVICE, INC., et al.
No. 5843.
Court of Appeal of Louisiana, Fourth Circuit.
September 10, 1974.
Rehearing Denied October 9, 1974.
Writs Refused November 22, 1974.
*547 John P. Nelson, Jr., New Orleans, John F. Meyer, Gretna, for Andy C. Harper, appellant-appellee.
A. R. Christovich, Jr., New Orleans, for New Orleans Public Service, Inc., defendant-appellant.
Before GULOTTA and BOUTALL, JJ., and BAILES, J. Pro Tem.
*548 BOUTALL, Judge.
This is a suit directed against New Orleans Public Service, Inc., for injuries received while plaintiff was painting an outdoor advertising sign on the roof of a building in the City of New Orleans. Plaintiff sustained an electrical shock when an extended aluminum paint roller used by him came into contact with an uninsulated overhead electrical wire owned and maintained by NOPSI. After trial by jury, a verdict and subsequent judgment were rendered in favor of plaintiff in the amount of $350,000. Defendant appeals seeking reversal. Plaintiff also appeals but seeks only an increase in the amount of the award.
This being a jury case, there are no reasons for judgment or findings of fact supporting the judgment. No interrogatories were addressed to the jury and only a general verdict was delivered. Since there are issues as to the liability of the defendant, contributory negligence of the plaintiff, and quantum, we will examine each in turn.
The primary issue on the question of liability is plaintiff's contention that the defendant failed to comply with City Ordinance 15,603, CCS of the City of New Orleans (Amended by Ordinance 16,564) and Section 21-36 of the Code of the City of New Orleans which state that electrical line and power conductors, cables and wires need not be covered by insulation provided they are strung in conformity with the safety rules for installation and maintenance of supply conductors of the United States Department of Commerce National Bureau of Standards Handbook H32 (hereinafter designated as H32). Specifically, plaintiff contends that H32 provides that no overhead unguarded wire of a particular voltage shall be located less than eight feet horizontally and eight feet vertically from buildings or its attachments (balconies, platforms, etc.) and that the offending wire was strung at a distance of seven feet two inches horizontally and approximately four feet seven inches vertically from the top of the sign. Plaintiff concedes, however, and the evidence is clear that the wire was strung diagonally at a distance of eight feet six inches (give or take an inch) from the top corner of the sign and was not located directly horizontally nor directly vertical to the sign. Nevertheless, plaintiff argues that while the diagonal distance is greater than eight feet, the horizontal and vertical distance requirements of H32 were not met and the defendant is in violation. According to plaintiff, because the wire was located too close to the sign, his extended aluminum paint roller came into contact with it causing the electrical shock resulting in the injury. This violation by NOPSI, insists plaintiff, is the proximate cause of the accident.
Defendant, on the other hand, in seeking to absolve itself from liability contends that while the city ordinance and the code make reference to H32, this handbook has been superseded by National Electrical Safety Code H81 (hereinafter designated as H81) which are the current safety rules for the installation and maintenance of electrical supply and communication lines. They insist H32 is obsolete and was not in use at the time of the occurrence of the accident on March 4, 1971.
Defendants further point out that according to H81, the minimum clearance requirements for the running of unguarded wires from buildings or their attachments (balconies, platforms, etc.) is three feet horizontally and eight feet vertically. They contend that since this wire was strung diagonally at a distance of eight feet seven inches, the diagonal clearance exceeded the requirements according to the provisions of H81. They rely on Section 234(C)(4)(a) of H81 which provides as follows:
"* * * The horizontal clearance covers above the roof level to the point where the diagonal equals the vertical clearance requirements. From this point the diagonal clearance shall be equal to the vertical clearance requirement." *549 This provision, defendant argues, places a requirement of a minimum clearance for a diagonal wire to be run (at the diagonal location in the instant case) of not less than three feet. Applying this provision to H32, they argue, the diagonal clearance requirement is not less than eight feet.
It is significant, at this point, to recognize that H32 is silent on minimum diagonal clearance requirements. Defendant therefore argues, if H32 is applicable, then the method for determining diagonal clearance (since H32 is silent) is the method set out in H81, which for clarity, will be designated as the arc method. Employing this method, the diagonal clearance requirement from the top corner of the sign is an arc not less than eight feet in diameter. Since the offending wire has a clearance from the top of the sign of eight feet seven inches, there is no violation.
Plaintiff counters by insisting that the accepted and logical method for interpreting diagonal clearance distance is by projecting outward horizontally eight feet and upward vertically eight feet. From these two, horizontal and vertical lines are drawn to a point where the two lines meet. To this point from the top corner of the sign, according to this method (which we refer to as the projection method), plaintiff and his experts calculate the required clearance for a diagonal wire is in excess of eleven feet. Therefore, the eight feet seven inch diagonal distance is in violation of H32. The difference in these two methods of determining diagonal clearance is the basic difference in the two contentions assuming that H32 is applicable.
The first question for determination is which of two national electrical safety codes are applicable in this case, H32 or H81. It is clear from the testimony of both the plaintiff's and defendant's experts that the code in use at the time of the accident and at the time of the location of the wire was H81. However, it is equally clear that the City Ordinance and the Code of the City of New Orleans makes specific reference to National Bureau of Standards Handbook H32. A consideration of the ordinance shows that an amendment was made to another section. However, no amendment was made to that section referring to H32. We find ourselves in a situation, then, where the electric industry is using a revised, amended and updated handbook (H81). However, the city ordinance and city code require the use of an older handbook (H32). We find a further anomalous situation in that the code makes reference to a particular handbook and the chief inspector of the City of New Orleans, George Flach, stated that he expected the New Orleans Public Service to use the latest handbook edition, H81. While this apparent conflict exists, nevertheless, the language of the ordinance is clear and unambiguous. It makes reference to H32 specifically. While the electric industry has adopted a more recent and updated handbook, the ordinance does not refer to it. Any standard adopted by industry, particularly those relating to safety requirements, must be adopted by the governing body of a municipality, city, parish, or state before they can be accepted as the standard of safety for that governing body whether it be a municipality, a city or otherwise. Particularly is this true when the safety requirements are reduced or lessened as here (from a horizontal clearance of eight feet in H32 to a horizontal clearance of three feet in H81). It is clear, then, that H32 is applicable in the instant case. The ordinance could have been easily amended. It was not. This addresses itself to a legislative function and not a judicial one.
We turn now to the next question, i. e., is the eight feet seven inch diagonal clearance of the offending wire sufficient to meet the minimum standards as set forth in H32? We must assume that the jury found the clearance to be insufficient and we examine the evidence in that light.
While the record is clear that the wire was located diagonally approximately eight feet six inches from the sign, it is also *550 clear that diagonal clearance is not defined in H32. Only minimum horizontal and vertical clearance is specified. It is important, then, that the minimum horizontal and vertical clearance of eight feet be met and that the minimum diagonal clearance be determined based on these clearances.
A projection downward from the location of the wire to a point horizontal to the edge of the sign shows a clearance of seven feet two inches from the sign. This line is in the nature of a plumb line. Dr. Robert L. Drake and Robert C. Williams, plaintiff's experts, suggested this as the proper and logical method for determining horizontal clearance in this instance under H32. Defendant's expert, George Flach, also indicated that this method is used in determining a horizontal clearance. Adopting this method, it is clear, then, that the wire has less horizontal clearance than eight feet as required in H32. It is also clear that the vertical distance is approximately four feet seven inches (give or take an inch) and is also less than the eight feet vertical clearance required in H32. Drake and Williams further projected the minimum diagonal clearance at some few inches in excess of eleven feet in accordance with the projection method.
However, defendant's experts suggest that this method is not accepted in the electric industry but the method employed for determining diagonal distance in this instance is an arc method. Defendants suggest assuming that H32 minimum clearance requirements are used, the diagonal distance along an arc from eight feet horizontal to eight feet vertical is a constant eight feet. Since this wire has an eight feet seven inch clearance they argue, logically, there is no violation. The diagonal clearance they suggest then, is eight feet. The fallacy in defendant's argument is that diagonal clearance is not specified in H32 but minimum horizontal and vertical clearances are required.
Additionally we must point out that the question of minimum clearance is a question of fact. The dispute apparent in the testimony of the expert witnesses had to be resolved in favor of plaintiff by the jury. We cannot say under the evidence presented, that such a conclusion is manifestly erroneous.
It is further significant to point out that these requirements are minimum ones. The general provisions of H32 and H81 clearly recognize the advisability and necessity of using greater safety standards in circumstances where it can be reasonably anticipated that the building, platform or structure is generally accessible and subject to the presence of workmen or other persons. Those provisions of H32 and H81 are identifical and are as follows:
(The following are the language in H32 only.)
Section 234(C) (4) (b)(2)
"GUARDING OF SUPPLY CONDUCTORS. Supply conductors of 300 volts or more between conductors shall be properly guarded by grounded conduit, barriers, or otherwise, under the following conditions:
* * * (1) (not applicable)
"(2) Where such supply conductors are placed near enough to windows, verandas, fire escapes, or other ordinarily accessible places, to be exposed to contact by persons."
Section 202 provides:
"The rules state the minimum requirements for spacings, clearances, and strength of construction. More ample spacings and clearances or greater strength of construction may be provided if other requirements are not neglected in so doing."
Section 211 provides:
"All electric supply and communication lines and equipment shall be installed and maintained so as to reduce hazards to life as far as practicable."

*551 Section 214(A):
"To promote safety to the general public and to employees not authorized to approach conductors and other current-carrying parts of electric supply lines, such parts shall be arranged so as to provide adequate clearance from the ground or other space generally accessible, or shall be provided with guards so as to isolate them effectively from accidental contact by such persons."
Furthermore, our jurisprudence, as reflected by Boure v. New Orleans Public Service, Inc., 255 So.2d 776 (La.App. 4th Cir. 1971) and Calton v. Louisiana Power and Light Co., 56 So.2d 862 (La.App. 2d Cir. 1952) amended and affirmed 222 La. 1063, 64 So.2d 432, has recognized the need for the exercise of reasonable care in circumstances where it can be readily anticipated that persons will work or frequent an area in close proximity to a supplier conductor or electric wire. However, we are quick to recognize that in the Boure case we concluded that NOPSI had knowledge that construction workers painting the underside of a bridge were in close proximity to a high tension wire which subsequently came into contact with the injured party. There is no actual knowledge of NOPSI in this case. In the Calton case, supra, the public utility company was absolved from liability when the court concluded, among other things, that a high power wire was strung at a greater distance than the standard recommended by the United States Bureau of Standards. Though it is arguable that both cases are distinguishable from the instant one; Boure because the public utility company had knowledge and Calton because the utility company was absolved from liability; nevertheless, both cases are significant because of the high standard required of an electric company in the placement and maintenance of its dangerous, unguarded wires. The standard required both in the general and specific provisions of H32 and in our jurisprudence as reflected by Boure and Calton were not satisfied in the instant case.
Clearly, the offending wire met neither the general nor the specific requirements of H32. NOPSI is, therefore, in violation of H32 and the city ordinance. It is equally clear that the proximity of the wire to the top of the sign is a proximate cause of the accident. See: Dixie Drive It Yourself System v. American Beverage Co., 242 La. 471, 137 So.2d 298 (1962).
Having found negligence on the part of the defendant, we now pass to a consideration of the issue of contributory negligence of the plaintiff.
It is well settled in our jurisprudence that contributory negligence is not presumed, but must be proved as any other fact by a preponderance of evidence. Layne v. Louisiana Power & Light Co., 161 So. 29 (La.App. 2nd Cir. 1935).
It is equally well settled that when a person is in the presence of a known danger, it must be shown that the plaintiff voluntarily and unnecessarily exposes himself to that danger. Stansbury v. Mayor and Councilmen of Morgan City, 228 La. 880, 84 So.2d 445 (1955). The Stansbury case is very similar to the instant one. Plaintiff's deceased husband came in contact with high voltage wires while painting a house, and according to the coroner, was electrocuted. The deceased was simply found dead on the ground at the bottom of the ladder. The court there held that in the absence of proof to the contrary, plaintiff's deceased husband was presumed to have acted with ordinary care.
Harper testified he was aware of the presence of the wires. He stated that he had worked for his employer for about a month prior to the accident and had worked for a little over a week with Louis Blady, his co-employee who was his partner painting the sign at the time of the accident. According to Harper, he and Blady were "blocking out" or painting over the advertising lettered part of the sign. *552 As is the practice, Harper was painting the upper part of the sign, Blady was painting the lower part. Harper painted from the top down to approximately the middle of the sign and Blady painted from the bottom up. The sign was approximately eleven or twelve feet in height and Harper was standing on an angle iron on the rear of the sign, facing the front and leaning forward while painting. In this position, he was painting in an up and down motion with the use of a 10 or 11 foot extended aluminum paint roller. Blady was standing on the roof of the building in front of the sign. Harper testified that he did not know how the accident occurred. However, he stated he was painting in the manner described by lowering and elevating the pole when he received the electrical shock. Neither Blady nor Harper saw the pole make contact with the wire. The evidence from these two persons was that Blady was more experienced and each considered him to be Harper's boss on the job site, and, as such, Harper took instructions from Blady.
Even though a workman may be aware of the existence of electrical power lines, it is not an assumption of the risk per se, nor is it negligence per se to work in the vicinity of those lines. Barrois v. Service Drayage Co., 250 So.2d 135 (La. App. 4th Cir. 1971).
There was no evidence that either Harper or Blady were engaging in any practice that was unusual, careless or exceptionally dangerous. Blady stated that Harper was "painting in the accepted method in accordance with usual work practices." Harper was supplied by his employer with the 10 or 11 foot extended aluminum paint roller that was being used by him at the time of the accident. Were Harper doing something other than painting in the usual customary way at the time of the contact with the wire, perhaps there might be merit to a charge of contributory negligence on Harper's part. However, in the instant case, there is no finding of such negligence.
Again, we must point out that the jury verdict was general in this respect and the record contains no interrogatories on negligence nor on contributory negligence. However, the record does show that the jury was charged by the judge on contributory negligence. After some deliberation, the jury returned into court to request further charges and explanations of the definition of contributory negligence. Soon after this the verdict was announced. The verdict in plaintiff's favor is indicative that the jury failed to find that plaintiff was, in fact, contributorily negligent. Under these circumstances, it is not within the province of this appellate court to determine that perhaps we would reach a different conclusion upon our examination of the evidence and substitute our opinion for that of the jury. Instead, we are bound by the rule that the trier of fact should be upheld unless we find manifest error in the record. We cannot say the jury verdict is manifestly erroneous in this case.
Since argument before us in this case, we have handed down the case of Gros v. Louisiana Power & Light Co., 288 So.2d 364, (La.App. 4th Cir. 1974) in which the jury under somewhat similar circumstances found for defendant by a 10 to 2 vote. That case involved a man electrocuted while on top of a metal tank using a long metal pole which possibly contacted overhead electric lines of defendant. That case differs from the case at bar in that there was no showing whatever of a violation of the National Safety Code by the defendant and the main issue before the appellate court was the correctness of the charge to the jury. However it does demonstrate, as do nearly all of the cases involving exposed electrical wires, that each decision must stand or fall on its own peculiar facts. To reverse the jury in this case, we feel, would be to substitute our conclusions from the evidence for the conclusions drawn by the jury. We find no manifest error.
We now consider the amount of the award as determined by the jury. We cannot conclude, as suggested by plaintiff *553 that the jury abused its discretion in awarding an inadequate sum.
There is no doubt that plaintiff's injuries are serious. However, there is every indication that the jury carefully weighed the extent of the injuries against the amount awarded.
Plaintiff is a 23 year old man with a wife and one child. At the time of the injury he was earning $6,000 per year. His work life expectancy was computed at 39.6 years. Melville Z. Wolfson, an economist, computed plaintiff's total expected earnings at $369,990.60 at a 5 percent discount considering costs of living increases, price increases and fringe benefits. We note that some of Wolfson's premises are simply incorrect, however, there is undoubtedly severe economic loss. The medical bill at Charity Hospital totaled, according to the exhibits, $27,553.15. There was evidence that a person was needed in constant attendance at a projected cost of $14,400 per year. While Harper would require rehabilitation and physical therapy for an indefinite time of long duration, this is federally funded at no cost to the plaintiff. According to plaintiff and his wife, drugs averaged approximately $140 to $150 per month.
As a result of the injuries, plaintiff is a paraplegic. He suffered second and third degree burns of 35-40 percent of his body. He further sustained a fracture of the twelfth thoracic vertebrae (broken back) with compression of the spinal cord in the front aspect of the spinal column. Plaintiff's right hand and left leg above the knee required amputation. The hipbone was shaved down and partially removed. Harper is completely paralyzed below the chest and has no control over his bladder, bowels or sexual function. He will be required to urinate through a tube inserted through the abdomen into the bladder. In the early part of 1972, Harper was placed under the care of Dr. Norman Gilbert, the Director of the Rehabilitation Center at Charity Hospital, after having been hospitalized for approximately a year where he underwent innumerable operations including innumerable skin grafts and amputations. Dr. Gilbert testified that in addition to the other injuries Harper sustained nerve injury to the left arm which caused a clawing of the fingers of the left hand. Further operative procedures will be necessary, however, without any assurance of a positive result. According to plaintiff and his wife, Harper lives in continuous pain and with the fear that he will become resistant to antibiotics and, therefore, subject to dangerous infections and poisons.
The nature of plaintiff's injuries are such that it is difficult to weigh them by monetary standards. We cannot say that the amount of the award is inadequate or excessive. The jury was of the opinion that the injuries justified an amount in the sum of $350,000. Though we may not arrive at the same figure, we cannot now say that in setting the amount awarded there was an abuse of the jury's broad discretion. Accordingly, the judgment is affirmed.
Affirmed.
JULIAN E. BAILES, J. Pro Tem., dissents with written reasons.
JULIAN E. BAILES, Judge Pro Tem. (dissenting).
While I do not accede to the rationale of the holding, nor to the finding itself, that defendant was guilty of actionable negligence in its placement of the electric wires, assuming arguendo that the defendant was negligent herein, the contributory negligence of the plaintiff bars his recovery.
In treating this issue, the majority finds "there was no evidence that either Harper or Blady (Harper's co-worker) were engaged in any practice that was unusual, careless or exceptionally dangerous. Blady stated that Harper was `painting in the accepted method in accordance with usual work practices.' Harper was supplied by *554 his employer with the 10 or 11 foot extended aluminum paint roller[1] that was being used by him at the time of the accident. Were Harper doing something other than painting in the usual customary way at the time of the contact with the wire, perhaps there might be merit to a charge of contributory negligence on Harper's part. However, in the instant case, there is no finding of such negligence." (Emphasis supplied by dissenter.)
In this finding, the majority has simply begged the question of Harper's negligence. The fallacy of such holding is that it assumes that the "accepted method", for whatever Blady meant by that term, was free of negligence. It is too obvious to merit further argument that an "accepted method" under one factual circumstance might be action free of negligence, but when these same methods are employed in the performance of certain work under different circumstances, as in this instant case, there is gross negligence.
The facts are these: From the standing position plaintiff occupied behind the sign board, in order to apply paint to the vertical board, he passed the aluminum extension handle up and down through his hands. Necessarily his body and arms projected above the top of the sign. A view of the extension handle shows that it has large holes in it caused by the electrical charge burning or melting away metal. This is mute and unimpeachable evidence that the plaintiff extended the metal handle so high as to make contact with the charged conductors. The majority neither examine nor discuss the facts of negligence. In effect, the majority says that with Harper standing on the metal framework behind the sign raising and lowering the extension there was no negligent actions on his part because this is the usual and customary method of painting sign boards.
Plaintiff admittedly was aware of the electric wires above the sign board. He admitted he had this knowledge before he started painting.
The observation by the majority that the trial court jury returned to the court for further instructions on contributory negligence of itself adds no greater authority to its erroneous verdict. It is presumed that the jury did consider all of the trial court's instructions.
In Smolinski v. Taulli, 276 So.2d 286 (1973), our Supreme Court defined contributory negligence as "* * * conduct on the part of the plaintiff which falls below the standard to which he should conform for his own protection. * * *. The standard of conduct to which the plaintiff must conform for his own protection is that of a reasonable man under like circumstances. * * *."
To paint a sign board from atop of it in the manner of extending a metal rod in close proximity of highly charged electric transmission wires, without taking any precautions whatever to avoid contact with this known dangerous instrumentality, is unmistakably an unusual, careless and exceptionally dangerous undertaking. Without observing and employing at least reasonable safeguards to prevent contact with the lines is gross negligence, and is a voluntary and unnecessary exposure to a known danger. Such action on the part of the plaintiff is negligence which solely and proximately caused his injury. There is no presumption of negligence. Contributory negligence herein has been proved by a clear preponderance of the evidence.
Plaintiff's conduct certainly fell below the standard to which he should have conformed for his own protection. His conduct obviously did not conform to that of a reasonable man under like circumstances.
*555 The case of Stansbury v. Mayor and Councilmen of Morgan City, 228 La. 880, 84 So.2d 445 (1955), cited by the majority, is distinguishable on the facts and has no application herein.
The majority relies on the case of Barrois v. Service Drayage Co., 250 So.2d 135 (La.App.1971) as authority for the pronouncement that "even though a workman may be aware of the existence of electrical power lines, it is not an assumption of the risk per se, nor is it negligence per se to work in the vicinity of those lines." Under the facts found by the court in the Barrois case I have no quarrel with its statement of the law. However, the facts of the Barrois case are so unlike the instant case, it clearly had no application. Therein the court found that Barrois was injured by Bersuder (the crane operator) negligently placing the boom and cable of the dragline so close to the high powered line without locking the boom to secure its position and in engaging in this operation with restricted visibility overhead. The fact which distinguishes the Barrois case from the instant case is that Barrois was not injured by his own negligent conduct but by that of a third party, Bersuder. The tenor of the case is more to support this dissent than to add anything to the majority.
The majority cites, but precludes the necessity of any discussion in this dissent, the cases of Boure v. New Orleans Public Service, Inc., 255 So.2d 776 (La.App.1971) and Calton v. Louisiana Power and Light Co., 56 So.2d 862 (La.App.1952). The majority recognizes the inapplicability of the holdings in these cases, however, relies thereon to support its finding of primary negligence of defendant.
Also, the holding in Gros v. Louisiana Power and Light Co., 288 So.2d 364 (La. App.1974) is not apropos to the instant case. The point at issue therein was the correctness of a jury charge.
We are required to examine the record in a jury-tried case the same as a judgetried case, both being reviewable on the facts and the law, and when the facts or the law of the case will not support the verdict, it is our duty to render a judgment accordingly. Such is this case. The judgment is not supported by the facts or the law; it is manifestly erroneous, and the judgment appealed should be reversed.
Therefore, I respectfully dissent.
NOTES
[1] It cannot pass unnoticed or without comment that the paint roller was not aluminum but rather the roller was equipped with a 10 or 11 foot aluminum extension handle. Aluminum, of course, is a metal highly conductive of electricity.