327 So.2d 585 (1976)
Terry N. BURLEY
v.
LOUISIANA POWER & LIGHT COMPANY et al.
COAL OPERATORS CASUALTY COMPANY
v.
LOUISIANA POWER & LIGHT COMPANY et al.
Nos. 6573, 6574.
Court of Appeal of Louisiana, Fourth Circuit.
February 10, 1976.
Rehearings Denied March 16, 1976.
Writs Refused May 4, 1976.
*587 Monroe & Lemann, W. Malcolm Stevenson, New Orleans, J. Wayne Anderson, Metairie, for Louisiana Power & Light Co., defendant-appellant.
O'Keefe, O'Keefe & Berrigan, Allen H. Danielson, Jr., New Orleans, for Rockwood Ins. Co., plaintiff-appellee.
Cockfield & Gravolet, James C. Cockfield, New Orleans, for Terry N. Burley, plaintiff-appellee.
Bruce J. Borrello, New Orleans, for Pratt-Farnsworth, Inc., defendant-appellee.
Before SAMUEL, GULOTTA and SCHOTT, JJ.
GULOTTA, Judge.
This matter is on remand to this court from the Louisiana Supreme Court. These consolidated suits resulted from an October 25, 1967 industrial accident in which plaintiff was injured by electrocution during the construction of the Belle Chasse Water Purification Plant.
The district court rendered judgment in Burley's favor and against LP&L in the sum of $165,500.00. The trial court further ordered reimbursement, from the proceeds of the award, to Rockwood Casualty Company (formerly Coal Operators Casualty Company), the compensation insurer of plaintiff's employer. Defendant appealed. Plaintiff, in answer to the appeal, sought an increase in the award.
On appeal to this court, we found that the violation of safety standards set forth in the National Electrical Safety Code should not be given probative weight in the absence of evidence that the Code's safety standards had been adopted by an ordinance or state statute or that the Code had been accepted as the standard of practice in the community or municipality. Accordingly, we set aside and annulled the trial court's judgment and remanded the matter to afford all parties an opportunity to submit any evidence which they deemed appropriate to show applicability of the Code. On review, the Louisiana Supreme Court reversed and concluded that the Code was to be considered and to be given probative weight. The matter was remanded to this court and is now before us on the merits.
Burley, an iron worker employed by a subcontractor, was threading a reinforcing rod, 25 feet in length, into a beam while working close to the edge of an unfinished three story building when the rod came in contact with an LP&L power line located 5'7" from the nearest point of the building. Plaintiff fell to the ground and was injured. According to LP&L, it cannot be charged with knowledge that a three story building, built within 8 feet of their power line and at an approximate height of 31 *588 feet from the ground (the approximate height of the wire), would be constructed to replace the pre-existing one story structure. In a supplemental brief on remand to this court, LP&L contends that assuming the Supreme Court recognized (H81) as the standard with which LP&L must comply[1] and gave the Code probative weight, this finding, by itself, is not dispositive of the negligence issue absent notice by LP&L of the construction changes at the Belle Chasse project. In addition, defendant contends that a factual finding that location of the wire was within the prohibited minimum distance requirement will not permit plaintiff to recover unless the violation was the proximate cause of plaintiff's accident and injuries.
Further, LP&L argues that plaintiff was contributorily negligent because of his failure to see the wire and to take proper precautions for his safety. Finally, defendant complains of the excessiveness of the award.
It is plaintiff's contention on remand that a determination by the Supreme Court (1) that the Electrical Code (H81) is the standard applicable in the instant case, and (2) that LP&L violated this standard, constitutes negligence on the part of defendant. According to plaintiff, the negligence of LP&L has been disposed of by the Supreme Court decision, thereby limiting our consideration to contributory negligence and quantum. In connection with quantum, plaintiff seeks to have the award increased to $521,785.00.

NEGLIGENCE OF LP&L
As determined by the Supreme Court, the National Electrical Safety Code (H81) requires that an uninsulated conductor, supplying voltage of 13,000 volts, be located a minimum required vertical and horizontal distance of 8 feet from the edge of a structure. The Supreme Court further held that the wire was in fact 5'7" from the edge of the building. Clearly, according to the Supreme Court decision, the standard or duty placed on LP&L was violated.
LP&L takes issue with this approach. It contends that Table 4 of the Code, requiring a clearance of eight feet where "voltage of supply conductors" is 8,700 to 15,000, was erroneously applied by the Supreme Court. According to LP&L, no showing was made by plaintiff that the offending conductor carried the amount of voltage (8,700 to 15,000) requiring the 8 foot clearance. This argument might have merit, but we are powerless to consider it. The Supreme Court determined that these particular wires were not the required distance from the building where plaintiff was working. LP&L's only remedy is to prevail upon the Supreme Court to modify its own findings.
However, under our jurisprudence, as reflected by the cases of Hill v. Lundin & Associates, Inc., 260 La. 542, 256 So.2d 620 (1972), Pierre v. Allstate Insurance Company, 257 La. 471, 242 So.2d 821 (1970) and Dixie Drive It Yourself System New Orleans Co. v. American Beverage Company, 242 La. 471, 137 So.2d 298 (1962), plaintiff is entitled to recover only if defendant's conduct was a cause in fact of the injury and the duty breached by defendant was designed to protect against the particular risk involved. Clearly, the location of the wire in close proximity to the building was a cause in fact of the accident. It is clear also that the minimum clearance requirements are designed to protect those persons who might work on or frequent buildings or structures in close proximity to an uninsulated wire. See Harper v. New Orleans Public Service Inc., 300 So.2d 546 (La.App., 4th Cir. 1974) and the cases cited therein.
We reject LP&L's argument that even if the wire was located a minimum distance of 8 feet vertically and horizontally from *589 the edge of the building, it is more probable than not that Burley would have placed the rod into the conductor causing the injury. Therefore, LP&L claims the location of the wire was not the proximate cause of the accident. There exists no evidence in the record to support this contention. Defendant's argument is based on speculation and is without foundation.
Under the circumstances, we conclude that the violation of the Code constitutes a cause in fact of the accident and that the violation was a breach of LP&L's duty to protect against the particular risk.
We reject also LP&L's contention that it was not placed on notice that the three story structure was being constructed within the prohibited vertical and horizontal clearance requirements to an uninsulated pre-existing LP&L wire. The record is clear that during the time the pilings were being driven at the Belle Chasse project, LP&L did have a man on the job and did provide protective coverings (snakes)[2] on the wiring. Once LP&L was apprised of the continuing construction and became aware that the pilings were being placed in close proximity to the wire, it had a duty to protect the construction workers from foreseeable danger by making further inquiry into the nature and extent of the construction and by continuing to provide insulation or covering for the wire.[3]
Furthermore, the Supreme Court found specifically that "The code requires, not only that the conductors be installed according to these standards, they must likewise be maintained in that manner." 319 So.2d at 337. Thus, a continuing affirmative duty was imposed on LP&L in this case to ascertain that the building was encroaching on the minimum clearance and to maintain the wire at the required minimum distance. LP&L cannot absolve itself of responsibility because it received no notice from others of the encroachment.
It is generally recognized by our jurisprudence that the highest degree of care is placed on those who utilize dangerous high power lines in their business operations. The law is complied with when the company provides such protection as will safely guard against any contingency that is reasonably to be anticipated. Bourne v. New Orleans Public Service, Inc., 255 So.2d 776 (La.App., 4th Cir. 1971), writ refused, 260 La. 857, 257 So.2d 432 (1972). LP&L violated this standard.
Under the circumstances, we conclude that LP&L was negligent and this negligence was a legal cause of the accident. See Dixie Drive It Yourself System New Orleans Co. v. American Beverage Company, supra.

CONTRIBUTORY NEGLIGENCE
Contributory negligence is an affirmative defense and like any other fact must be proved by a preponderance of the evidence. See LSA-C.C.P. art. 1005; Stansbury v. Mayor and Councilmen of *590 Morgan City, 228 La. 880, 84 So.2d 445 (1955). The record indicates that other employees and supervisors were aware of the presence of the uninsulated wire and of its potential hazard, but contains no evidence that any warning was given to plaintiff or that he was aware or should have been aware of the apparent danger. At the time of the accident, Burley and Donnie Hilton, a co-worker and witness to the accident, were threading a 25 foot reinforcing rod into beams located on the roof of the third floor of the unfinished building. The fateful day of the accident was the first day that plaintiff worked on the Belle Chasse job. According to Burley and Hilton, they reported to work at approximately 7:30 a.m. and commenced to carry the roads from the ground floor to the third floor roof. This task occupied the morning hours. At approximately 12:30, after plaintiff and Hilton had returned from lunch, they commenced to thread the rods into the beam. At the time of the accident, the first rod was being threaded. Plaintiff and Hilton testified that Hilton was located almost in the middle of the approximately 30 foot square roof area, facing the direction of the uninsulated wire, and plaintiff was situated a few feet from the edge of the building, approximately 15 to 20 feet from Hilton and facing him. This position placed plaintiff with his back to the wire. According to both employees, Hilton was pushing the 25 foot rod to plaintiff, who allowed the rod to slide through his hands in the direction of the wire and over the edge of the building. While the rod was sliding through plaintiff's hands, it came in contact with the power line. Burley, according to Hilton's testimony, went into flames. After striking an air compressor, Burley then fell from the roof to the ground.
It is clear that Burley cannot be charged with being aware of the potential hazard. Photographs indicate that the wire was located at approximately the same height as the floor where the men were working, indicating that the presence of the wire was not apparent to them. The accident occurred during plaintiff's first day on the job and while plaintiff was working with his back to the wire. In this regard, we might point out that Hilton did not become aware of the presence of the power lines until he had worked on the job for approximately a week. Even if, as defendant contends, it could be shown that plaintiff had actual knowledge or should be charged with knowledge of a known danger, it is well settled that when a person is in the presence of a known danger, it must be shown that he voluntarily and unnecessarily exposed himself to the danger before contributory negligence will be found. Harper v. New Orleans Public Service Inc., supra. No showing has been made by defendant that Burley voluntarily or unnecessarily exposed himself to danger. Under the circumstances, we cannot conclude that the trial judge erred in not finding plaintiff contributorily negligent. Burley is entitled to recovery against LP&L.

QUANTUM
We now direct our attention to the quantum question. Immediately after the accident, plaintiff was transported by ambulance to West Jefferson Hospital where emergency treatment was administered. On the same day, he was transferred to Touro Infirmary.
Medical reports introduced into evidence reveal that plaintiff sustained a linear fracture of the right temporal bone, bleeding of the right ear, a deep jagged scalp laceration, multiple second and third degree burns of both hands and of the anterior portion of the right thigh, the entire left leg and thigh, and severe tissue damage to the area of the first, second and third does of the left foot, caused by the burn, which resulted in a transmetatarsal amputation of the left foot.
Burley was hospitalized from October 25, 1967, the date of the accident to November 30, 1967.

*591 The trial judge itemized the damages as follows:

1. Past and future pain and
 suffering $ 60,000.00
2. Skull fracture 5,000.00
3. Scar on right thigh 500.00
4. Partial loss of foot 25,000.00
5. Past and future loss of
 wages 75,000.00
 ____________
 TOTAL $165,500.00

Burley was seen by Dr. R. C. Grunsten on October 26, 1967 at Touro. He classified burns, covering plaintiff's entire left upper extremity below the elbow, as first and second degree. There were possible third degree burns of the palm of the left hand. Dr. Grunsten also indicated that Burley had received third degree burns over the forward part of the right thigh, presumably at a point where contact was made with the rod. Dr. Grunsten found first and second degree burns over the left lower extremity through the lower thigh and calf region. He indicated that Burley had suffered a large area of soft tissue loss of the left foot, approximately one and one half inches in diameter, which made necessary a transmetatarsal amputation of the left foot. The burned area of the right thigh was excised.
As a result of the amputation, Burley is required to walk on the side of his foot, the foot is tender and if he slips or bumps it in any way, pus pockets form on the foot, the calf of one leg has become smaller and plaintiff has become unstable in walking and in climbing.
After the amputation, plaintiff received therapy and walked on crutches for about three months. A plate had been inserted into the sole of the left shoe, and he used this as a prosthesis for his forefoot until the plate broke. He then wore a rubber pad to prevent the shoe from pinching his foot. He now wears foam in the soles of his shoes.
An ear injury was treated by Dr. Samuel Zurik who upon initial examination found the right ear filled with blood and debris. Because of the chance of infection, however, he did not remove the blood clot until two weeks after the accident.
Dr. Jack Wickstrom, an orthopedic surgeon, examined Burley on March 29, 1973. Plaintiff related complaints of pain in the stump of his left forefoot and a weakness in his leg when he walked or attempted to use the foot. He gave a history of the foot being swollen and puffy when it was painful. Dr. Wickstrom discovered some atrophy in plaintiff's left calf. He attributed this to plaintiff's inability to push off with his left foot which resulted in a wasting of the calf muscle.
The doctor's examination revealed an area of marked tenderness of plaintiff's left forefoot which hurt when the doctor tapped it. The pain was caused by a small spiking bone near the amputated area of the big toe.
Dr. Wickstrom is of the opinion that Burley has reached maximum recovery. On most industrial scales, the doctor would evaluate this injury to be an approximate 60% disability of the foot. In the doctor's opinion, Burley could not reasonably be expected to climb, walk or stand on a narrow beam for any length of time.
Mr. Mike Callas, an ironworker, indicated that climbing is a physical activity required of ironworkers. Hilton testified to the same effect.
When we consider the seriousness of the injuries suffered by plaintiff, together with the residual effect resulting from the amputation, we cannot say that the sum of $90,500.00 in damages awarded for pain and suffering, burns, skull fracture, scar of the right thigh and partial loss of the foot, constitutes an abuse of discretion.
*592 We now direct our attention to the $75,000.00 award for past and future loss of wages. At the time of the accident, Burley, 23 years of age, was employed as an ironworker-foreman, earning an hourly wage of $5.25, together with $.20 per hour in fringe benefits. According to his 1967 income tax return, he earned $8,330.00. In 1968, because of convalescence from the injuries sustained, he earned only $1,200.00. He earned $5,091.00 in 1969; $6,002.00 in 1970; $6,889.00 in 1971 and $8,500.00 in 1972.
It is clear from the testimony that the amputation of the toes of the left foot caused Burley to become unstable. He could no longer climb and walk on beams, duties required of an ironworker. As a result, plaintiff is unable to resume his occupation.
According to Burley, the hourly earnings of ironworkers increased from 1967 through 1973, the time of trial. Based on a 40 hour week, plaintiff contends that he could have earned $87,000 during this period. Plaintiff further contends that his actual earnings from the same period total $35,515.00. When this amount, $35,515.00, is subtracted from the $87,300.00 figure, plaintiff has sustained, according to his calculations, a total loss of past earnings in the sum of $51,785.00. In connection with future loss of earnings, plaintiff claims that according to the life expectancy table (LSA-R.S. 47:2405), Burley has a life expectancy of 40.10 years. He computes his annual future anticipated loss at $8,000.00 per year, totalling a future loss of earnings in the sum of $372,585.00. According to his analysis, Burley contends that a $133,000.00 award invested at a 6% annual return would allow $8,000.00 per year for loss of earnings.
LP&L, on the other hand, contends the trial judge erroneously equated loss of earning capacity with loss of earnings. According to LP&L, at the time of the trial, Burley was earning $800.00 per month at a truck and tractor parts supply house. LP&L, therefore, argues that since his earnings at the time of trial equated the approximate earnings of an ironworker-foreman for the same time, Burley has sustained no loss of future wages. Defendant suggests that plaintiff should be compensated for the 10 month period during which time he was unable to return to work.
Because no reasons were assigned by the trial judge, we are unable to ascertain how he arrived at the $75,000.00 figure for past and future loss of earnings. Also, because of the sparsity of evidence in the record relating to loss of future earnings, it is difficult to ascertain on what basis the $75,000.00 award was computed.
Clearly, as conceded by LP&L, plaintiff is entitled to loss of earnings for the 10 month period during which time he was unemployed. According to the testimony of Mike Callas, business manager of the ironworkers' union, an ironworkerforeman earned $5.43 per hour during this 10 month period. Additional fringe benefits in the amount of $.20 per hour were also provided. Based on a 40 hour week, we compute the weekly loss of earnings to be $225.20. This figure, i. e., $225.20, multiplied by the approximate time that Burley was out of work, i. e., 37 weeks, totals $8,332.40.
According to Burley, in August, 1968, he received $65.00 per week as a car salesman. During October, 1968, he received $70.00 per week in the same job. He testified that in December of 1968, he commenced working for Delta Truck and Tractor Company at a weekly earning of $85.00. At the time of trial (November, 1973), Burley was earning $800.00 per month. According to plaintiff's income tax returns, his gross total income for the years 1968 through 1972 totalled $27,682.00. From August, 1968 (when Burley returned to work) to December, 1972, the same comparable period covered by the income tax returns, the average hourly wage earned *593 by a foreman was $7.17 per hour. Based on a 40 hour week, we compute the average weekly wage earned by an ironworker-foreman to equal $286.80 per week. Multiplying 228 weeks (August, 1968 through December, 1972) by $286.80 per week, we reach the total of $65,390.40. When the actual earned wages between August, 1968 and December, 1972, i. e., $27,682.00, is subtracted from the total earnings which would have been realized by Burley as an ironworker-foreman for the same years, i. e., $65,390.40, we compute the loss of earnings for that period to be $37,708.40.
Although not clear from the record, it appears that Burley's earnings in 1973 approximated $800.00 per month. For the same comparable period, i. e., January 1, 1973 through November, 1973, the month of the trial, Burley's earnings as an ironworker-foreman, computed at an average hourly wage of $8.27 for that period X 40 hours per week X 48 weeks, equal $15,878.40. When we subtract the $8,800.00 earned by Burley for the same comparable period, we compute the balance to be $7,078.40.
Plaintiff's past loss of earnings from October 25, 1967 through November, 1973 totals $53,119.20.
RECAPITULATION

Past Loss of Earnings:
1. From October 25, 1967 $ 8,332.40
 through July, 1968
2. From August, 1968 37,708.40
 through December, 1972
3. From January 1, 1973 7,078.40
 through November, 1973
 __________
Total Loss of Earnings from $53,119.20
October, 1967 through November,
1973 (Date of Trial)

FUTURE LOSS OF EARNINGS
When considering future loss of earnings, we are confronted with uncertainties, making it difficult to arrive at a reasonable amount without engaging in speculation. For example, although Burley's climbing ability has been impaired, we cannot say that his earning ability has been necessarily impaired. Burley testified that he had been in military service and had the benefit of a three year college education and has, since the time of the accident, been employed in occupations other than ironworking. At the time of trial, his work history indicated a steady increase in salary. We cannot speculate that even if the accident had not occurred, Burley would continue employment as an ironworker. Nor can we say that the disability of the foot prevented employment in other aspects of the construction field.
We are mindful of the principle that a plaintiff need not prove loss of earnings with mathematical certainty, but only by such proof as reasonably establishes the claim. However, we are also bound by the principle that trial courts have reasonable discretion to make awards based on all of the facts and circumstances of the case. See: Jordan v. Travelers Insurance Company, 257 La. 995, 245 So.2d 151 (1971); Fox v. State Farm Mutual Automobile Insurance Company, 288 So.2d 42 (La.1973).
Considering the entire record, particularly according to our calculations that Burley sustained a loss of past earnings in the sum of $53,119.20, and considering the speculation factor involved in the computation of future loss of earnings, we cannot say that the $75,000.00 award made by the trial judge for this item of damages is an abuse of his discretion.

REIMBURSEMENT OF WORKMEN'S COMPENSATION INSURER
Rockwood Insurance Company, intervenor in the instant case, is the insurer of Westbank Reinforcing Steel Corporation, plaintiff's employer. The trial court judgment ordered reimbursement to Rockwood *594 in the sum of $13,560.00, together with all additional workmen's compensation benefits and medical benefits paid to or on behalf of plaintiff under Louisiana Workmen's Compensation laws. Rockwood is entitled to reimbursement for the total amount paid in compensation and medical payments. See Barrois v. Service Drayage Company, 250 So.2d 135 (La.App., 4th Cir. 1971); LSA-R.S. 23:1101, 1103. The judgment is affirmed.
Affirmed.
NOTES
[1] Burley v. Louisiana Power & Light Co., 319 So.2d 334 (La.1975).
[2] Temporary covers placed on uninsulated wires when work is being done in proximity to the wire.
[3] See Freibert v. Sewerage and Water Board of New Orleans, 159 So. 767 (La.App., Orl. 1935); Bordelon v. Continental Casualty Company, 229 So.2d 761 (La.App., 3d Cir. 1969), writ refused, 255 La. 483, 231 So.2d 396 (1970); Layne v. Louisiana Power and Light Co., 161 So. 29 (La.App., 2d Cir. 1935); Stansbury v. Mayor and Councilmen of Morgan City, 228 La. 880, 84 So.2d 445 (1955); Webb v. Louisiana Power and Light Co., 199 So. 451 (La.App., 2d Cir. 1940).

Defendant, LP&L, relies on Webb, supra, for the proposition that insulation was not required in the instant case. Webb recognized that the electric company had an alternative duty to either insulate the wires or comply with Federal government safety requirements relating to minimum clearances. In Webb, unlike the instant case, there was compliance with the Federal safety requirements relating to minimum vertical clearance. LP&L failed to either insulate or follow the National Electrical Safety Code.