433 So.2d 1083 (1983)
Lucille Brown BROCK, Individually and as Natural Tutrix for Her Minor Daughter, Arrendia BROCK
v.
NEW ORLEANS PUBLIC SERVICE, INC.
Pamela THEARD, For the Use and Benefit of the Minors, Katina Marie THEARD and Shon Antheony Theard
v.
NEW ORLEANS PUBLIC SERVICE, INC.
Lucille Brown BROCK, Individually and on Behalf of Her Minor Daughter, Arrendia BROCK
v.
Preston SMITH and Harwood Koppel.
Nos. CA-0215 to CA-0217.
Court of Appeal of Louisiana, Fourth Circuit.
May 11, 1983.
Rehearing Denied July 26, 1983.
*1085 C.B. Ogden, II, New Orleans, for New Orleans Public Service, Inc.
Darleen M. Jacobs, New Orleans, for Lucille Brown Brock, et al.
Sidney D. Torres, III, Keith S. Giardina, Chalmette, for Pamela Theard, et al.
Philip C. de Verges, New Orleans, for Preston Smith.
Before WARD and LOBRANO, JJ., and G. WILLIAM SWIFT, Jr., J. Pro Tem.
WARD, Judge.
On June 17, 1979, Melvin Brock, a roofer by trade, was fatally injured while attempting to carry a section of roof guttering up an aluminum ladder to the roof of a two-story building. Apparently, the guttering came in contact with one of two overhead electrical transmission lines owned by New Orleans Public Service, Inc. (NOPSI). A low voltage line carrying 110 volts was located fifty-six inches from the edge of the roof of the house. It had originally been insulated but the insulation had deteriorated, and for all practical purposes, it was uninsulated. An uninsulated high voltage line carrying twenty-four kilovolts was 102 inches from the edge of the roof of the house. Both lines run from pole to pole parallel to the street and the front of the house. The contact resulted in an electrical shock that caused Melvin Brock to fall from the ladder to the pavement below. He sustained severe head injuries in the fall and died of these injuries the following day.
The decedent's wife, Lucille Brock, filed suit individually and as natural tutrix for her minor daughter, Arrendia Brock, seeking damages from NOPSI for the death of her husband. The decedent's natural children, Kaina Marie Theard and Shon Antheony Theard, also filed suit through their tutrix, Pamela Theard, who is the former girlfriend of Melvin Brock, and they also seek damages from NOPSI. The two cases were consolidated and, after full trial, the jury rendered a verdict against NOPSI and awarded $25,000.00 in general damages to Lucille Brock and $5,000.00 to Pamela Theard for the use and benefit of the two minor natural children. NOPSI appeals the judgment of the Trial Court, and both plaintiffs have answered the appeal, seeking an increase in the damage awards.
*1086 The issues raised by this appeal are: (1) Whether NOPSI was negligent in constructing or maintaining the uninsulated overhead electrical transmission lines in close proximity to the house; (2) Whether Melvin Brock was contributorily negligent; and (3) Whether the plaintiffs are entitled to an increase in the damage awards.
The Louisiana Supreme Court has recently applied a duty-risk analysis in determining the issue of negligence on the part of the defendant-utility company in two cases similar to this one. See Kent v. Gulf States Utilities Co., 418 So.2d 493 (La.1982); Hebert v. Gulf States Utilities Co., 426 So.2d 111 (La.1983).
Duty-risk analysis basically involves three separate inquiries. Initially, it must be determined whether the defendant contributed to plaintiff's harm, i.e., whether the conduct of defendant was a cause-in-fact of plaintiff's harm.[1] The second inquiry is whether there is a rule or principle of law, either statutory or jurisprudential, creating a duty to protect this type of plaintiff from this type of harm. The final inquiry is whether defendant breached the duty, i.e., whether defendant acted reasonably. See generally Hill v. Lundin & Associates, Inc., 260 La. 542, 256 So.2d 620, (La.1972) and Crowe, "The Anatomy of a TortGreenian, as interpreted by Crowe who has been influenced by Malone-A Primer", 22 Loy.L.R. 903 (1976).
The evidence establishes that the conduct of NOPSI, more particularly, the location and condition of the uninsulated, overhead transmission lines, contributed to Melvin Brock's injuries; NOPSI's conduct was a cause-in-fact. Doctor Monroe Samuels, who performed the autopsy, testified that the cause of death was a skull fracture with extensive contusions of the brain. He also testified that Brock suffered superficial burns on his chest and left arm and electrical burns on the palm of the left hand, and he testified that these burns were "most compatible" with those caused by contact with a low voltage transmission line. Two electrical burn marks were found on the roof guttering which Brock had been carrying; one mark was 100 inches from one end of the guttering, and one mark was three inches from the other end of the guttering. The aluminum ladder used by the decedent was partially melted at the foot. Witnesses at the scene of the accident heard a noise when the guttering made contact with a wire, and they saw the wire closest to the house, the low voltage wire, shaking. An electrical outage was caused, and a NOPSI serviceman was called to investigate. He testified that he observed a "nick" on the high voltage line where something had contacted it. Although there was contradictory testimony as to whether the low voltage or high voltage wire was contacted, the evidence clearly establishes that the guttering came in contact with one of the two active, uninsulated, overhead transmission wires and that Brock suffered an electrical shock and fell nearly two stories to the pavement below.
We next determine whether NOPSI had a duty to protect Melvin Brock from injuries arising in this manner. The Code of The City of New Orleans, Section 21-36 of Ordinance No. 828 M.C.S. provides that the safety of overhead electrical transmission lines shall be determined by their conformity with the safety rules for installation and maintenance of electric supply lines of the most current edition of the National Electric Safety Code (N.E.S.C.).[2]
*1087 The N.E.S.C. is updated from time to time, and the 1977 edition was in effect at the time of the accident, June 17, 1979. Section 234 of the 1977 N.E.S.C. sets out minimum horizontal clearances for overhead transmission wires adjacent to buildings as 60 inches for low voltage wires and 120 inches for high voltage wires. Section 20, Rule 202(b)(2) provides, however, that existing installations, including maintenance replacements, which comply with prior editions of the Code need not be modified to comply with the rules of the 1977 edition.
The two wires now in question were constructed sometime prior to 1952, and the high voltage wire was converted from thirteen to twenty-four kilovolts in 1972. The low voltage wire was installed and maintained 49½ inches from the edge of guttering cans on the house, and the high voltage line was installed and maintained 97 inches from the edge of the guttering cans.[3] N.E. S.C. editions prior to 1977 required a 36 inch horizontal clearance for the low voltage line and a 96 inch horizontal clearance for the high voltage line. Thus, the clearances of the wires in question conformed to national industry standards at the time the wires were constructed, although they were inadequate according to 1977 standards. Considering the "grandfather clause" of Section 20, Rule 202(b)(2) of the 1977 N.E.S.C., however, we find that NOPSI did not breach the duty to place and maintain the wire within the minimum horizontal clearance requirements of the N.E.S.C.
NOPSI argues that compliance with the N.E.S.C. minimum clearance standards precludes a finding of negligence. We disagree. Mere compliance with minimum safety standards does not, per se, relieve the utility company of negligence. Kent v. Gulf States Utilities, supra, Simon v. Southwest Louisiana Electric Membership Corp., 390 So.2d 1265 (La.1980); McKowen v. Gulf States Utilities Company, 358 So.2d 675 (La. App. 1st Cir.1978). Section 20, Rule 202(A) of the 1977 N.E.S.C. reflects an awareness on the part of the drafters that compliance with minimum standards is not always adequate. This section provides that "[t]o meet service or operational criteria, it may be necessary to exceed these requirements or to provide additional design and construction features." In addition to the basic minimum horizontal clearance requirements, the N.E.S.C. imposes a more general duty on utility companies to insure that "[A]ll electric supply and communication lines and equipment ... be installed and maintained so as to reduce hazards to life as far as is practical." Section 20, Rule 211.
Electric companies who utilize and maintain high power lines have a duty to exercise the highest degree of care to avoid injury to others. See, e.g., Simon v. Southwest Louisiana Electric Membership Corp., supra; McKowen v. Gulf States Utilities Company, supra; Burley v. Louisiana Power and Light Company, 327 So.2d 585 (La. App. 4th Cir.1976) writ refused, 332 So.2d 278 (La.1976); Boure v. New Orleans Public Service, Inc., 255 So.2d 776 (La.App. 4th Cir.1971) writ refused, 260 La. 857, 257 So.2d 432 (La.1972).
In determining whether NOPSI breached the duty to "reduce hazards to life as far as is practical" and to exercise the highest degree of care to avoid injury to others, we must review the evidence in light of the jury's finding of negligence, and that finding should not be disturbed unless it is manifestly erroneous. See Arceneaux v. Domingue, 365 So.2d 1330, on remand, 370 So.2d 1262, (La.App. 3rd Cir.1979), writ refused, 374 So.2d 660 (La.1979); Canter v. Koehring Co., 283 So.2d 716 (La.1973).[4]
*1088 The house at 722-24 Foucher Street in New Orleans, where Brock was working when the accident occurred, was originally constructed and used as a fire station, and it was purchased by the current owner, Mr. Harwood Koppel, at a public auction. Mr. Koppel testified that he bought the property as an investment, intending to make repairs and renovations in order to re-sell the house at a profit. According to Mr. Koppell's testimony, such repairs and renovations were typical in the area because the neighborhood was enjoying a trend of improvements by investors at the time of the accident.
The overhead transmission lines in question ran parallel to Foucher Street between the front of the houses and the street. Most of the houses on Foucher Street are one-story wood frame structures set back from the street. Mr. Koppel's house, however, was a two-story wood frame built much closer to the street than the other houses. Thus, the house was much closer to the transmission lines.
The accident occurred when Melvin Brock attempted to carry a twenty-foot section of guttering can up an aluminum ladder to the roof of the house. He had balanced the guttering evenly on his shoulder and was holding it in place with his left hand while holding the ladder with his right hand. Two roofers who worked with him testified that this was his usual method of carrying guttering up a ladder and that this method was customarily used by roofers without incident. Brock had ascended the ladder almost to the level of the roof when the guttering contacted one of the wires.
A utility company is not legally bound to safeguard against occurrences that cannot be reasonably expected or contemplated, but if it should be reasonably anticipated that persons may come in contact with electric lines, the company, as the owner and custodian of those lines, is required to insulate them or to give adequate warning of danger or to take other proper and reasonable precautions to prevent injury. Simon v. Southwest Louisiana Electric Membership Corp., supra; Nessmith v. Central Louisiana Electric Company, 257 So.2d 744 (La.App. 3rd Cir.1972) writ refused 259 So.2d 921 (La.1972); Burley v. Louisiana Power and Light Company, supra; Boure v. New Orleans Public Service, Inc., supra; Calton v. Louisiana Power and Light Company, 56 So.2d 862 (La.App. 2nd Cir.1952).
In deciding whether NOPSI had a duty to protect Brock from this type of harm, that is, whether protection of this particular plaintiff from this particular risk of injury is within the scope of NOPSI's duty, "... [f]oreseeability is not always a reliable guide, and certainly, it is not the only criterion for determining whether there is a duty-risk relationship.... The ease of association of the injury with the rule [duty] relied upon, however, is always a proper inquiry." Hill v. Lundin and Associates, Inc., supra at 622; see also, Hebert v. Gulf States Utilities Company, supra.
In cases in which someone on the ground has been injured because they contacted uninsulated overhead transmission wires through extraordinary or unusual means, utility companies have not been held liable because there was no ease of association between the utility's conduct and the resulting injuries; the injuries were not within the scope of the risk. See, e.g., Kent, supra, and Simon, supra.
The risk is different, however, for one who customarily works above the ground and on the roof of a structure which is very close to two uninsulated overhead transmission lines. The risk that a roofer placing a section of guttering on the roof of a two-story building will be injured by electrocution by inadvertently touching one of two uninsulated power lines, which are located no more than four and eight feet from his work place, comes within the scope of the utility company's duty to exercise the highest degree of care to reduce hazards to life as far as is practical.
*1089 Another consideration is the ease of avoidance of the risk, in this case, either by relocating the transmission lines or by replacing uninsulated lines with those that are safely insulated. Professor Ambrose K. Ramsey, Jr., who testified as an electrical engineering expert, was of the opinion that the placement design for the lines should have allowed for the differences between a tall structure located close to the street and the other one-story structures set back from the street. We agree. The utility company could have reasonably anticipated that maintenance and repair of the house would be necessary from time to time and that workmen would be required to be near the uninsulated wires. Therefore, we find that the defendant utility company owed the plaintiff Brock a duty to protect him from the risk of electrocution and that NOPSI breached this duty by failing to reduce the hazard either by locating the uninsulated transmission wires farther from the house or by installing safely insulated ones.[5]
Having found that the evidence supports the jury's determination that NOPSI was negligent, we now consider whether the evidence likewise supports the jury's finding that Melvin Brock was not contributorily negligent.
Contributory negligence is an affirmative defense and, like any other fact, it must be proved by a preponderance of the evidence. Burley v. Louisiana Power and Light, 327 So.2d 585 (La.App. 4th Cir. 1976) writs denied 332 So.2d 278 (La.1976); La.C.C.P. Art. 1005. It is not per se contributory negligence for a person to work in close proximity to power lines. Dyson v. Gulf Modular Corporation, 338 So.2d 1385 (La.1976). The determinative issue is whether the plaintiff's conduct conformed to the standard of care that would be exercised by a reasonable man. That standard varies according to whether the plaintiff had knowledge of the danger.
A person with no actual or implied knowledge of the danger has a right to rely on those who have a duty to protect his safety. He may assume he is not exposed to a danger which could come into existence only from a breach of duty which others owe to avoid injury to him. Allien v. Louisiana Power and Light, 202 So.2d 704 (La.App. 3rd Cir.1967). When the person is in the presence of a known danger, it must be shown that he voluntarily and unnecessarily exposed himself to the danger before contributory negligence will be found. Burley v. Louisiana Power and Light, supra at p. 590.
There is no direct evidence that Melvin Brock was aware of the hazard created by the overhead wires. He is legally charged with awareness of the presence of the overhead transmission lines, however, because they were readily apparent to anyone exercising even the most casual observation. See Boure v. New Orleans Public Service, supra. Even so, Brock may not have perceived the danger because the evidence indicates that the low voltage wire, the wire closest to the house, gave the appearance of being insulated.
The low voltage wire was insulated when it was installed sometime prior to 1952, and as of the time of the accident in 1979, the original insulation had not been replaced. The insulation was so badly deteriorated, however, that portions of the wire were exposed. The wire hung 27 feet and 8 inches above the ground.[6] Although several electrical expert witnesses and a NOPSI serviceman testified that the worn condition of the insulation was visible from the ground, a safety expert testified that Brock, who did not have training or experience with electrical equipment, could have been lulled into a false sense of security by the appearance of the wire as observed from the ground.
Photographs introduced at trial depict the wire as viewed from various angles. *1090 The pictures support the safety expert's opinion that the appearance of the wire closest to the house, as seen from the ground, would not alert the observer that a hazard existed. Therefore, although Melvin Brock knew or should have known of the presence of the overhead transmission lines, the evidence does not prove that he knew or should have known that the low voltage line created a hazardous condition.
The high voltage line was never insulated and was hung 35 feet above the ground. Considering this height and the deceptive appearance of the low voltage wire, which was closer to the ground and more visible, and after viewing the photographic evidence, we conclude that the uninsulated condition of the high voltage line was not readily apparent to an observer standing 35 feet below the wire. Therefore, Melvin Brock is not legally charged with awareness of this danger, and his conduct is to be judged accordingly.
Brock was attempting to carry a twenty foot section of guttering up an aluminum ladder when the accident happened. It is difficult to conceive of a truly safe way to perform such a task, and although Brock's actions may be characterized as a participating factor in the resulting electrical shock, they may not be characterized as contributorily negligent unless they were unreasonable in light of all the circumstances. Dyson v. Gulf Modular Corp., supra.
The evidence establishes that it is typical or customary for roofers to carry guttering sections of that length up a ladder and that the method used by Brock to carry the section was also customary. Having concluded that Brock had no actual or implied knowledge of the hazardous uninsulated condition of the wires, we conclude that it was reasonable for Brock to go about his work in the customary manner and to do so in apparent reliance that the wires were installed and maintained so as to protect those individuals, such as himself, who could be reasonably anticipated to come into close proximity to the wires. Thus, the conclusion of the jury that Melvin Brock was not contributorily negligent is supported by the evidence and is not manifestly erroneous. See Arceneaux v. Domingue, supra; Canter v. Koehring, supra.
The final issue for our review is whether the damage awards to Lucille Brock and Pamela Theard are inadequate. Before a Court of Appeal can disturb an award made by a Trial Court, the record must clearly reveal that the trier of fact abused its discretion in making the award. If it is found that the award is below the point which is reasonably within the much discretion afforded to the trier of fact, the appellate court is not free simply to decide what it considers to be an appropriate award on the basis of the evidence. The appellate court may disturb the award only to the extent of raising it to the lowest point which is reasonably within the fact-finder's discretion. Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1977).
The jury awarded $25,000.00 in unitemized general damages to Lucille Brock, individually and for the benefit of the minor daughter, Arrendia Brock. We believe the record clearly shows that the jury abused its discretion in making this award.
Brock was twenty-six years old at the time of his death. According to actuarial computations, he had a work life expectancy of thirty-five years and a physical life expectancy of forty-one years from the date of trial. An economist testified that, using the calculation "most adverse" to the decedent and based on the minimum wage, Brock could have been expected to receive $259,000.00 in earned income. Additionally, the economist estimated that from the time of his death until trial, Brock could have been expected to earn $9,000.00. These expected earnings calculations do not include reductions for tax liability or living expenses.
In addition to seeking damages for lost income, Lucille Brock sued for compensation for her husband's pain and suffering; he survived in a semi-conscious state nearly twenty-four hours after the accident. Although he was able to move slightly in bed, Mrs. Brock testified that he was unable to *1091 speak to her. He had undergone surgery for massive head injuries and was scheduled for a second operation when death occurred. Lucille Brock also asked for damages for the loss of love and affection from her husband. Arrendia Brock was two years old at the time of the trial, and damages are claimed for her loss of love, affection, and guidance.
Based upon all of the evidence, we conclude that the Trial Court manifestly erred in its general damage award of $25,000.00 to Lucille Brock. Indeed, the record supports an increase of the award to $75,000.00 to Lucille Brock, Individually and $25,000.00 to Lucille Brock as natural tutrix of her minor daughter, Arrendia Brock, which represents the lowest point reasonably within the jury's discretion. See Coco v. Winston Industries, Inc., supra.
The jury awarded $5,000.00 to Pamela Theard; $2,500.00 each for the benefit of the two minor children, Katina Marie Theard and Shon Antheony Theard. Katina was ten years old, and Shon was eight years old at the time of trial. The record indicates that Brock's involvement with these children decreased after his relationship with their mother ended, and there was contradictory testimony regarding his involvement with the children after his marriage to Lucille Brock in 1974. It appears that Brock occasionally contributed some financial support to Katina and Shon, but there was contradictory testimony on this matter also. Considering all of the evidence, we conclude that the award to Pamela Theard is not below the lowest point within the much discretion afforded to the jury.
For the above reasons, the judgment of the Trial Court is affirmed except as to the damage award to Lucille Brock which is amended to $75,000.00 individually and $25,000.00 to Lucille Brock as the natural tutrix of her minor daughter, Arrendia Brock.
NOTES
[1] This inquiry does not call for a determination of the substantial, legal or proximate cause of the injury. Rather, it is a threshold inquiry as to whether defendant played any role in causing the harm suffered.
[2] The National Electric Safety Code is an American National Standard formerly published by the National Bureau of Standards and currently published by the Institute of Electrical and Electronics Engineers, Inc. It contains standards reached by a consensus of committee members who represent over twenty organizations concerned with safe installation and maintenance of electric supply stations and transmission equipment. According to its statement of purpose, the N.E.S.C. contains basic minimum provisions considered necessary for safeguarding persons from hazards arising from electrical equipment.
[3] For the purpose of determining compliance with safety standards, we consider the measurements from the edge of the guttering cans rather than from the edge of the house because the clearance is to be measured from the nearest part of the building concerned. 1977 N.E. S.C., Section 20, Rule 234.
[4] Because this case was tried by a jury, there are no reasons for judgment or specific findings of fact supporting the judgment. The answers to two general jury interrogatories indicate only that the jury found that Melvin Brock's death was caused by NOPSI's negligence and that Melvin Brock was not negligent. We must assume that the finding of negligence on NOPSI's part is based on a determination that NOPSI breached its duty by failing to have either insulated the exposed wires or located the wires farther away from the house.
[5] Although not binding in this case, it is noteworthy that the 1981 edition of the N.E.S.C. requires that all wires within ten feet of a building or other structure be insulated.
[6] This height conforms to N.E.S.C. requirements, as does that of the high voltage wire.