512 So.2d 487 (1987)
Michael F. CHINIGO
v.
GEISMAR MARINE, INC., Cooper Gilder Chemicals, Inc. and Phillip H. Kerr.
No. CA 86 0563.
Court of Appeal of Louisiana, First Circuit.
June 23, 1987.
Rehearing Denied August 26, 1987.
Writs Denied November 13, 1987.
*488 A. Clay Pierce, Baton Rouge, for Cooper Gilder defendant/appellant.
Victor Marcello, William Willard, Donaldsonville, for Michael Chinigo plaintiff/appellee.
Charles O'Brien III, James E. Moore, Baton Rouge, for Geismar Marine defendant/appellee.
Before GROVER L. COVINGTON, C.J., and LANIER and ALFORD, JJ.
LANIER, Judge.
This is a suit for damages in tort and for exemplary (punitive) damages by a police officer against the owner of a chemical tank truck. The suit alleges the tank truck was hauling a hazardous chemical, the tank truck leaked the chemical, the police officer investigated the chemical leak and was overcome by toxic fumes, the tank truck owner was absolutely, strictly and negligently liable to the police officer for his damages, and the tank truck owner was liable to the police officer for exemplary damages because of his wanton and reckless disregard for public safety in transporting hazardous substance. The tank truck owner answered, asserted the petition failed to state a cause of action for exemplary damages, asserted the police officer could not recover damages because he was a public servant acting in the line of duty, and pled the affirmative defenses of contributory negligence, comparative negligence, assumption of risk and victim fault. After a trial, special verdicts were rendered by a jury as follows:
(1) the tank truck owner's conduct caused the plaintiff's damages;
(2) the plaintiff assumed the risk;
(3) the plaintiff was contributorily negligent;
(4) the tank truck owner's fault was 75%;
(5) the plaintiff's fault or negligence was 25%;
(6) the plaintiff's actual damages were

(a) General damages (pain, suffering,
mental anguish and distress)
past and future -- $20,000
(b) Loss of past income -- -0-
(c) Loss of future income -- 20,000
(d) Past medical expenses -- 1,000
(e) Future medical expenses -- 20,000
 ______
 TOTAL $61,000

(7) the tank truck owner's fault constituted wanton and reckless disregard for public safety in the storage, handling or transportation of hazardous or toxic substances; and
(8) the proper amount of exemplary damages was $100,000.
The trial court rendered judgment in favor of the plaintiff for 75% of the actual and exemplary damages, that is, the total award of $161,000 was reduced to $120,750. The tank truck owner took this suspensive appeal. The plaintiff answered the appeal asserting the trial court committed legal error by reducing the actual and exemplary damage awards by 25%. The tank truck owner filed in this court a peremptory exception raising the objections of no right of action and no cause of action asserting that the plaintiff was a professional rescuer in the course and scope of his employment and had no right to recover for damages.

FACTS
On October 4,1984, the plaintiff, Michael F. Chinigo, a West Baton Rouge Parish sheriff's deputy, received notice that a tank truck was leaking some type of clear liquid onto the highway. This liquid was later identified as styrene monomer. Deputy Chinigo chased the tank truck with his lights on and siren sounding for one mile before the truck owned by defendant, Cooper Gilder Chemicals, Inc. (Cooper Gilder), stopped near the intersection of Louisiana Highway 1 and American Way in West Baton Rouge Parish.
*489 The tank truck did not exhibit any placards designating what it was transporting; therefore, after stopping the truck, Deputy Chinigo walked up to it to investigate the leak. The primary purpose of these placards is to let emergency responders know what a product is and what danger level it possesses.
After discovering that a stream of liquid was pouring from underneath the truck, Deputy Chinigo asked the truck driver for his paperwork concerning the truck's cargo. Deputy Chinigo returned to his unit and called in the identification number of the cargo to his dispatcher. Chinigo continued to investigate the leak when the dispatcher contacted him over his unit's loudspeaker advising him to stay away from the vehicle. Chinigo then told Deputy Caze to reroute all traffic.
Chinigo had already been exposed to styrene monomer for some time when he heard the dispatcher's warning. After receiving this warning, Chinigo returned to the area of the truck, upwind from the truck and the styrene monomer fumes.
Chinigo told a paramedic on the scene that he was dizzy and nauseated. Chinigo began to have dry heaves and then he partially passed out. Deputy Ed Rosell took Chinigo to Our Lady of the Lake Medical Center because he felt waiting for an ambulance would use up valuable time. Deputy Rosell said Chinigo was unconscious by the time they reached the hospital.
It was estimated at trial by Lieutenant Stephen Campbell that thirty to forty gallons of styrene monomer spilled onto the highway. Styrene monomer is a highly volatile, toxic chemical; it is considered hazardous.
Dr. Richard Parent gave the following testimony at trial:
[S]tyrene exposure includes eye irritation; respiratory tract irritation; headache; dizziness; nausea; intoxication; on occasion, abnormal E.E.G.s; chromosome elaborations; visual motor inaccuracies; conjunctival and forensial congestion; throat and eyes; central and peripheral nervous system effects, central being potentially going unconscious or feeling dizzy, peripheral being the type of tingling in your hands or loss of feeling, numbness, this kind of thing; lacrimation; nasal irritation; muscle soreness; headache; insomnia; anxiety; neuropathy. Neuropathy is again a peripheral nervous system type thing. There's some central nervous system effects in children exposed in utero, that is, in the uterus. Workers have complained, again, of headache, dizziness, drunkenness, fatigue, memory loss, difficulty in concentrating, emotional complaints.... It varies.
If the concentration of styrene monomer is strong enough, it can shut down a person's nervous system completely, causing death. It also affects the body in other ways. There are human studies showing exposure to styrene monomer causes kidney dysfunction. Styrene monomer is a mutagen in many different systems and produces cystogenetic damage in humans. Styrene monomer has also been shown to produce cancer in laboratory animals.
Because Chinigo became unconscious, the concentration of styrene monomer to which he was exposed was apparently high. At trial, it was estimated that a thousand parts of styrene monomer per million parts of air over thirty or forty minutes would be needed to render one unconscious. The maximum limit of styrene monomer to which a person can be safely exposed is presently set at one hundred parts per million in the air over eight hours a day, five days a week.
Following his immediate reactions of nausea and unconsciousness, Chinigo continued to feel ill. Deputy Chinigo was unable to work from October 4, 1984, to October 29,1984. For two weeks after the 29th of October, he was able to work only light, daytime duty. He had low back pain, frequent urination, and abnormal urine specimens which indicated kidney dysfunction. He also had diarrhea and abdominal cramps, broke out in sweats, and felt sleepy. Chinigo's symptoms were consistent with exposure to styrene monomer.
*490 James Gilder, president of Cooper Gilder, admitted at trial that he instructed the driver of the tanker to pick up the styrene monomer, even though he knew the driver did not have the proper placards to put on the truck designating it as carrying styrene monomer. Mr. Gilder also said he knew he was violating the law under the hazardous materials regulations by allowing the truck to haul styrene monomer unmarked. Mr. Gilder said he told his driver, "Well, I don't want to do it, but the man needs some help to get the stuff out of the trailer, so we will go on over there and get it and maybe everything will be all right and we'll try to get on home without the placards."
The tanks in which the styrene monomer was hauled had for the past few years been used to carry soap. The gaskets in these tanks were not the appropriate ones for styrene. Styrene monomer will dissolve gasket material with which it is not compatible, thus causing the tanks to leak. The defendant's expert at trial, Dr. Otra John Jacobus, agreed that a trucking company should have known the gasket used in the tank herein was made of the wrong material for hauling styrene monomer.
John Howard Cooper, a partner in the defendant chemical company, testified as to the ease of changing a gasket in a tank. He said one only has to take the bolts out and put a new one in. The procedure takes about fifteen or twenty minutes.

LIABILITY FOR TORT DAMAGES TO A PROFESSIONAL RESCUER

(Defendant's Peremptory Exception and Assignments of Error I and II)
Defendant contends that plaintiff has no right or cause of action because "professional rescuers who are injured while performing services within the course of their employment are unable to recover from the parties who caused the accident."
The objection of no right of action asserted in a peremptory exception raises the question of whether a remedy afforded by law can be invoked by the plaintiff and determines if the plaintiff has a right or legal interest in the subject matter of the suit. Fulford v. Green, 474 So.2d 972 (La. App. 1st Cir.1985). The objection of no cause of action raised in a peremptory exception tests the legal sufficiency of the petition, and all the allegations of the petition are accepted as true; an objection of no cause of action is sustained only where the law affords no remedy to plaintiff under the allegations of his petition. McGowan v. Ramey, 484 So.2d 785 (La.App. 1st Cir.1986).
In Mayor and Council of City of Morgan City v. Jesse J. Fontenot, Inc., 460 So.2d 685, 687-688 (La.App. 1st Cir.1984), this court stated as follows:
It is generally held that the risk of injury to a gratuitous rescuer is within the ambit of protection of the general duty not to create an unreasonable risk of harm to others. Stevenson v. Delahaye, 310 So.2d 651 (La.App. 1st Cir. 1975); F. Stone, 12 Louisiana Civil Law Treatise, Tort Doctrine § 282, at 391-392 (1977); Kaplan, Recovery by the Rescuer, 28 La.L.Rev. 609 (1968). This rule has been applied where the fault of a tortfeasor caused a fire and a gratuitous rescuer was subsequently injured. Inseco v. Cambridge Mutual Fire Insurance Company, 447 So.2d 606 (La.App. 3rd Cir.1984), writs denied, 449 So.2d 1349, 1350 (La.1984). However, recovery has been denied to professional rescuers who are injured in rescue operations.
....
A professional rescuer may recover, however, for injury caused by a risk which is independent of the emergency or problem he has assumed the duty to remedy. Langlois v. Allied Chemical Corporation, 258 La. 1067, 249 So.2d 133 (1971); Briley v. Mitchell, 238 La. 551,115 So.2d 851 (1959).
The following from Comment, Negligence Actions by Police Officers and Firefighters: A Need for a Professional Rescuers Rule, 66 Cal.L.Rev. 585, 598-602 (1978) is pertinent:
As already noted, the assumption rationale is that a person owes no duty to avoid the negligent creation of a situation hazardous to another person hired to *491 remedy that situation. This rationale is already applied to limit recovery by an independent contractor for injuries caused by the very condition that the contractor was hired to correct. Police officers and firefighters are likewise hired to remedy certain hazardous situations. The rationale is thus applicable to them also.
. . . .
The professional rescuers rule would operate as follows. Once a risk is properly classified as independent, the assumption rationale is inapplicable. The professional rescuer would recover for negligently caused injuries attributable to such a risk. Although the assumption rationale will bar recovery for most dependent risks, recovery should be permitted for certain dependent risks for two reasons. First, an equitable interpretation of the agreement between firefighters or police officers and the employer may lead to the conclusion that some dependent risks encountered by the professional rescuers are so extraordinary that it cannot be said that the parties intended the rescuers to assume them. Second, some conduct of the defendant may be so blameworthy that tort recovery should be imposed for the purposes of punishment or deterrence.
An `extraordinary' risk may be defined as one that deviates from the norm of risks encountered in a given community to the extent that the professional rescuer cannot fairly be said to have agreed to relieve citizens of responsibility for it. Risks may be extraordinary because the hazard is hidden or unknown, or because rescuers must remedy a risk that is beyond their training and experience.
These extraordinary risks could arise because the risk-generating object is itself extraordinary or because the object, while common in itself, is exceptionally hazardous because of its quantity or placement. For example, a reactive chemical such as potassium could present an extraordinary risk in any residence, regardless of the quantity. Fuel oil, on the other hand, would generally present an ordinary risk it [sic] it were stored in an exterior tank in reasonable quantity. The same fuel oil could also be extraordinary, however, if it were stored in excessive quantity or in an open container in a basement.
The second type of dependent risk for which recovery should be available, a blameworthy risk, will arise in either of two circumstances: (1) where a citizen's conduct varies from the standard of reasonable care to such a degree that society's need to punish or prevent the conduct exceeds the benefits gained from other tort goals; or (2) where the conduct varies from the standard of reasonable care to such a degree that it cannot be said that the professional rescuer consented to relieve the defendant of the duty of that standard of care. For example, it has been recognized that intentional torts against professional rescuers create liability even when the risk that causes injury is created by the emergency that the professional rescuer seeks to relieve. The concept of recklessness provides a threshold level of blameworthiness that would permit more certain and consistent judicial action while eliminating an increase in unmeritorious claims. Moreover, it is common in tort law to impose liability for aggravated conduct in instances where ordinary negligence will not create liability.
Thus, the principles of the assumption rationale may be developed into a bifurcated test that can be utilized to distinguish risks that professional rescuers assume from those that they merely knowingly encounter. First, the rule should not bar recovery for risks that are independent of the emergency or specific situation that the professional rescuer seeks to remedy. Second, of the risks that are dependent, those that are extraordinary or blameworthy should also result in recovery. The rule should only prevent recovery for those risks that are dependent and not extraordinary or blameworthy. [Footnotes omitted.]
The professional rescuer rule only bars recovery when the defendant is guilty of ordinary negligence. See Thompson v. *492 Warehouse Corporation of America, Inc., 337 So.2d 572 (La.App. 4th Cir.1976). Chinigo has alleged and proven that the defendant improperly handled a hazardous chemical in a wanton manner. The risk herein is extraordinary and one which was beyond the training and experience of Chinigo to remedy. In this factual posture, the professional rescuer rule does not provide a defense for the defendant.
The peremptory exception and these assignments of error are without merit.

ASSUMPTION OF THE RISKCOMPARATIVE NEGLIGENCE

(Defendant's Assignments of Error III and IV; Plaintiff's Assignment of Error I)
Defendant contends the trial court erred in allowing the plaintiff to recover after the jury finding that the plaintiff assumed the risk of his injury. The plaintiff responds contending the jury erred in finding the plaintiff assumed the risk, and the trial court improperly reduced the award by 25% for comparative negligence.
In Rozell v. Louisiana Animal Breeders Cooperative, Inc., 496 So.2d 275, 278 (La. 1986), appears the following:
To assume a risk, one must knowingly and voluntarily encounter a risk which caused him harm and must understand and appreciate the risk involved and accept it as well as the inherent possibility of danger because of the risk.... The opinion in Dorry v. Lafleur, 399 So.2d 559, 562 (La.1981) adopted the expression of assumption of the risk contained in the Restatement, Second, Torts, Section 496 D:
"`Except where he expressly so agrees, a plaintiff does not assume a risk of harm arising from the defendant's conduct unless he then knows of the existence of the risk and appreciates its unreasonable character.
Comment b explains:
The basis of assumption of risk is the plaintiff's consent to accept the risk and look out for himself. Therefore, he will not be found, in the absence of an express agreement which is clearly so to be construed, to assume any risk unless he has knowledge of its existence. This means that he must not only be aware of the facts which create the danger, but must also appreciate the danger itself and the nature, character and extent which make it unreasonable. Thus the condition of premises upon which he may enter may be quite apparent to him, but the danger arising from the condition may be neither known nor apparent, or if known or apparent at all, it may appear to him to be so slight as to be negligible. In such a case the plaintiff does not assume the risk. His failure to exercise due care either to discover or understand the danger is not properly a matter of assumption of risk, but of the defense of contributory negligence.'" (Emphasis added).
The determination of whether a plaintiff assumed a risk is made by subjective inquiry.
A review of the record reveals that Chinigo had no knowledge, or reason to believe, that the truck contained hazardous chemicals. It was therefore impossible for plaintiff to "understand and appreciate the risk involved." The jury's finding of assumption of the risk is clearly wrong manifestly erroneous. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978).
A person with no actual or implied knowledge of a danger has a right to rely on those who have a duty to protect his safety. He may reasonably assume he is not exposed to a danger which could come into existence only from a breach of a duty which another has to avoid injury to him. Brock v. New Orleans Public Service, Inc., 433 So.2d 1083 (La.App. 4th Cir.1983), writs denied, 437 So.2d 1147, 1148 (La. 1983). Defendant had a duty to protect the health and safety of the public by placing placards on the truck which indicated that it contained hazardous materials. La.R.S. 32:1501 and 1503(D); La.C.C. art. 2315. Plaintiff could reasonably assume he was in no danger because the truck had no such placards. The truck driver never cautioned the plaintiff about the hazardous substance. *493 Plaintiff was not notified of the danger by his radio dispatcher until after he had been substantially exposed to the styrene fumes. Thereafter, plaintiff stayed upwind of the truck and the hazardous fumes. Plaintiff was not contributorily negligent. The finding by the jury to the contrary is manifestly erroneous clearly wrong.
Plaintiff's assignment of error has merit; defendant's assignments of error do not have merit.

QUANTUM

(Defendant's Assignment of Error V)

Compensatory Damages
Defendant contends the jury award of $20,000 for pain and suffering is excessive. After a thorough review of the facts of this case, we cannot say that this award was a clear abuse of the jury's much discretion. Reck v. Stevens, 373 So.2d 498 (La.1979).
Defendant also contends the jury awards of $20,000 for loss of future income and $20,000 for future medical expenses are not supported by the evidence. At the time of trial, plaintiff was completely recovered from the short term effects of his exposure to styrene monomer and was back at work full-time. The record contains no evidence from which a reasonable trier of fact could have arrived at these damages. Insufficient evidence was offered to prove any probable expected loss of future earnings or any probable future medical expenses. See Dunaway v. Rester Refrigeration Service, Inc., 428 So.2d 1064, 1071-72 (La.App. 1st Cir.1983), writs denied, 433 So.2d 1056, 1057 (La.1983).
The jury erred factually in awarding plaintiff damages for loss of future earnings and future medical expenses. These portions of the compensatory damage award are reversed and set aside.

Exemplary Damages
The defendant contends the exemplary damage award is extremely excessive. Defendant argues that the spill was minor, and it has already been fined $5,500. The plaintiff asserts the $100,000 award is justified because the evidence shows the defendant knowingly and intentionally transported a dangerous chemical without the proper warning placards, styrene monomer is a dangerous chemical with a great potential for harm, and the leak was not minor.
La.C.C. art. 2315.3 provides as follows:
In addition to general and special damages, exemplary damages may be awarded, if it is proved that plaintiff's injuries were caused by the defendant's wanton or reckless disregard for public safety in the storage, handling, or transportation of hazardous or toxic substances.
The defendant does not contend that it is not liable for exemplary damages. After considering all of the facts and circumstances of this case, we conclude that the jury did not abuse its much discretion in fixing the exemplary damage award at $100,000.

DECREE
For the foregoing reasons, the trial court judgment is amended to award the plaintiff a judgment against the defendant for $121,000, with legal interest thereon from date of judicial demand until paid and for all costs. In all other respects, the trial court judgment is affirmed. The defendant is cast for the cost of this appeal.
AMENDED AND AFFIRMED.